UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
GERTRUDE STAFFORD,                                   :
                                                     :
                              Plaintiff,             :
                                                     :
              -against-                              :
                                                     :
NEW YORK PRESBYTERIAN HOSPITAL, BEN                  :
SCAGLIONE and MICHAEL WALSH,                         :
                                                     :
                              Defendant.             :
------------------------------------------------------------x

**MEMORANDUM & ORDER**

06-CV-2150 (ENV) (CLP)

**VITALIANO, D.J.**

Gertrude Stafford brings this action against her former employer, New York Presbyterian

Hospital (the "hospital"), and supervisors, Ben Scaglione and Michael Walsh, under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981, as well as

under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(1)(a).

Stafford claims that she was discriminated against on the basis of her race, as an African-

American, and sexual orientation, as a lesbian; she also claims retaliation by defendants after she

allegedly complained of discrimination. Defendants move for summary judgment pursuant to

Fed. R. Civ. P. 56. For the reasons stated below, summary judgment is granted in part and

denied in part.

**I.    BACKGROUND**

The following facts are drawn from the complaint and the parties' submissions on the

motion for summary judgment, including their respective Local Rule 56.1 filings.[1] All

---

[1]  Stafford failed to comply with Rule 56.1, which requires that "[t]he papers opposing a
motion for summary judgment shall include a correspondingly numbered paragraph
responding to each numbered paragraph in the statement of the moving party, and if
necessary, additional paragraphs containing a separate, short and concise statement of

1

reasonable inferences are drawn in favor of plaintiff, the nonmoving party. See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 456 (2d Cir. 2007).

## A.    Stafford's Employment History

Stafford began her employment as a security officer with the hospital on December 16, 1986; she was promoted to sergeant in April 1988, working the night shift from midnight to 8 a.m. Scaglione became the director of security, and Stafford's direct supervisor, in October 1996.

In April 1998, Stafford met with Kathryn Martin, senior vice president and chief operating officer at the hospital. At the meeting, Stafford claims that she complained to Martin of Scaglione's allegedly disparate treatment of African-American employees vis-à-vis white employees, including preferences given to white employees seeking promotions. An April 14, 1998 letter from Martin to Stafford, memorializing the meeting, does not mention disparate treatment but references: (1) concern regarding Scaglione's "management style" and the "atmosphere" in the department, (2) Stafford's apparently failed attempt to secure a promotion to lieutenant and a concern as to whether the process was "fair," and (3) Martin's intent to set up a follow-up meeting with Scaglione, a Dr. Robert Kelly, and Henry Dennis, the director of employee relations. It is unknown, however, whether Martin ever scheduled that meeting or whether it took place, or whether Scaglione was ever informed about Stafford's complaint against him. For her part, Stafford claims that after her meeting with Martin, the situation did

---

additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). Effectively, Stafford's statement included only the "additional paragraphs" while entirely omitting the required rebuttal of defendants' statement. Pursuant to Local Civ. R. 56.1(c), defendants' statement should be deemed admitted for purposes of the motion. However, the Court will assume arguendo that Stafford complied with Rule 56.1, as the outcome is the same either way.

not change. Stafford claims that the Martin meeting "seems to have only instigated severe retaliation," although there is little evidence in the record of specific retaliatory acts.

In February 1999, Scaglione met with Stafford and informed her that she was being considered for a lieutenant position on the midnight to 8 a.m. shift. Stafford received this promotion and assumed her new post on February 28, 1999. This promotion was short-lived. In December 1999, the hospital eliminated all three lieutenant positions in the security department. The three lieutenants affected were Stafford, Lieutenant Patrick Rice, and one Lieutenant Rivera. Stafford was demoted back to sergeant, along with Rice, a white male. Rivera was terminated for poor performance. In the nine months that Stafford was a lieutenant, other individuals had apparently filled the sergeant positions on the midnight to 8 a.m. shift, so Stafford was placed on the 4 p.m. to midnight shift. Stafford contends that this move was discriminatory; she argues that she should have been restored to her desired shift, midnight to 8 a.m., because she had more seniority than the other sergeants who had replaced her on that shift when she was promoted.

Then, in April 2000, Stafford received a negative performance review from Scaglione for the time period from April 1, 1999 to March 31, 2000, with an overall rating of "Needs Improvement." Stafford disputed this evaluation with Ronnie Meyers, in the hospital's human resources department. Meyers contacted Scaglione, who responded that Stafford's performance had declined after her demotion from lieutenant back to sergeant. Meyers suggested that the evaluation be amended, and Scaglione agreed. As a result, Stafford's performance as a lieutenant from April to December 1999 was given a rating of "Meets Standards," and her performance as sergeant from December 1999 to March 2000 was given a rating of "Needs Improvement."

3

Plaintiff received multiple reports of caution and written warnings on her record in 2000 and 2001. In November 2000, she was placed in what the hospital calls a Performance Improvement Plan ("PIP"), a six-month probationary period in which an employee receives increased supervision and training to improve his or her performance. As part of this PIP, which lasted until May 2001, Stafford was moved to the day shift, from 8 a.m. to 4 p.m. She then received an evaluation of "Unsatisfactory" for the time period from April 1, 2000 to March 31, 2001. Stafford submitted a written rebuttal of this evaluation. In response, Scaglione changed some of the wording of the evaluation but reiterated his conclusion in a letter dated November 15, 2001.

In March 2002, Stafford again received an annual evaluation rating her performance as "Unsatisfactory." In April 2002, she was placed on a six-month PIP a second time and moved to the day shift so that her performance could be monitored and improved. The PIP outlined numerous areas for necessary improvement, including "unprofessional and inappropriate" customer service, failure to discipline an officer for keeping a missing phone, "increased complaints that she speaks down to officers," failing to follow Scaglione's procedures, and failure to supervise her officers. When that second PIP ended, in October 2002, Scaglione wrote Stafford to inform her that she had not completely satisfied the goals of her PIP, showing improvement in some areas though not others, but, rather than terminate her, Scaglione provided Stafford with three more months to "pass" her PIP. After that three-month extension, in January 2003, Scaglione met with Stafford and told her that she had succeeded in meeting the goals of her PIP and would be moved back to the evening shift, from 4 p.m. to midnight.

On February 3, 2003, Scaglione wrote Stafford a letter, with the subject line "RE: Work Improvement Plan Final," to inform her that though she had "passed" her PIP, her performance

4

had been "inconsistent," with two PIPs, three reports of caution, and four written warnings since 1998. Consequently, Stafford was given a "final warning for future behavior . . . [a] final chance to maintain a "Meets Standard" level of performance" or else she would "be terminated from employment."

## B. Stafford's Sexual Orientation

Stafford is lesbian, but chose not to disclose her sexual orientation to any of her colleagues or supervisors. Sometime in 2000, Stafford did communicate with a hospital counselor, to whom she confidentially disclosed her sexual orientation. At least some of these communications were by telephone. Stafford now apparently claims that, since all telephone calls at the hospital are recorded and Scaglione was the only person with access to the recordings, Scaglione had to know that she was lesbian. Stafford also claims that her significant other sometimes telephoned her at the hospital. In any event, Stafford contends that it was common knowledge within the security department that she was lesbian.

## C. The Fire Incident and Stafford's Termination

On the evening of July 27, 2003, Stafford was the highest ranking security officer on duty. This much is certain: a female patient in the psychiatric emergency room ("Psych ER") started a fire at around 10:25 p.m. Officer Luis Burgos was stationed in the Psych ER at the time. Walsh ultimately led the hospital's investigation into the fire and its causes. But that is the extent of the parties' agreement, as they contest most of the other details of the incident.

Stafford had been present at the intake of the patient, along with Burgos, and ordered her to remove her clothing and to hand it over for inspection. According to hospital policy at the time, Psych ER patients were permitted to keep possession of their underwear only upon admission to the hospital. (It seems that Stafford was only present for this intake because of

5

hospital policy requiring that the security guard insuring the removal of a Psych ER patient's clothing be the same gender as the patient.) The hospital contends, without corroboration, that Stafford was charged with physically searching the patient, which she denies. The parties also dispute whether the patient retained her underwear and when, if ever, she removed it. It is apparently agreed that Burgos was then responsible for searching the patient's clothing and belongings. Stafford goes on to assert that the patient was not confined to her room and was caught smoking a half-hour before the fire, essentially arguing that she did her job but that Officer Burgos failed to do his.

What happened in the aftermath of the fire is also the subject of controversy. The hospital contends that Stafford failed to follow the established procedures after the fire alarm sounded. But again, there is no evidence before the Court clearly establishing what a security sergeant was supposed to do in case of fire and how plaintiff supposedly fell short. Stafford claims, though Scaglione and Walsh declare otherwise, that she carried out all of her responsibilities appropriately, including sending an officer to meet the fire brigade, remaining in the security office to coordinate the response to the fire, logging all of her actions, and notifying her superiors of the fire, including Scaglione and Walsh. She also claims that any problems with the log were not her responsibility and that other individuals altered the log. As for Burgos, the parties appear to agree that he failed to supervise the patient once she was admitted to the Psych ER, allowing her to smoke a cigarette and to start the fire, which burned part of the patient's gown and part the mattress in her room.

The parties also dispute both the severity of the fire and the accuracy of Stafford's account of the incident. The hospital claims that there was significant property damage as well as damage to the patient's gown, which, they allege, Stafford failed to report. Defendants also

contend that Stafford provided inconsistent and varying accounts of what happened and that she later admitted that some of her initial statements were incorrect.

At the same time, written reports of the incident, proffered by defendants, also appear to contain inaccuracies. For example, a corrective action report dated July 29, 2003 and signed by Walsh, which imposed a five-day suspension on Stafford, states that her "failure to supervise personnel resulted in the near death of a patient," whereas there is no dispute that the patient did not suffer any burns, let alone a life-threatening injury. Similarly, a memo summarizing Stafford's performance during the incident states that "[t]he temperature in the room exceeded 1200 Fahrenheit (twelve hundred) degrees [sic] causing the sprinkler to actuate," a figure that seems highly exaggerated and is unsupported by any official or scientific finding.

Ultimately, Walsh's investigation of the incident found that Stafford had improperly searched the patient, failed to supervise the security staff properly, made false statements regarding the severity of the incident, and intentionally misrepresented the extent of the fire damage in her initial reports. Officer Burgos was also found to have committed numerous errors in his response to the incident, and he was given an identical five-day suspension, plus a final warning. (There is no record evidence regarding Burgos's employment history before the incident.) According to defendants, based on Stafford's employment history and the fact that she had already been given a final warning, Scaglione decided to terminate her. But since he was out of the office, Scaglione asked Walsh to handle Stafford's termination.

On August 3, 2003, Walsh met with Stafford for that purpose. Stafford claims that Walsh did not provide a reason for her termination but told her: "You could leave now, we don't need your kind here." In Stafford's deposition, when she was asked for her understanding of what Walsh meant by "your kind," Stafford responded that she understood him to be referring to

7

homosexuals only. In defendants version of the August 3 meeting, Walsh explained to Stafford that her disciplinary record was a factor in her termination. But notably, defendants never directly deny Stafford's account of the words Walsh said.

## II.     STANDARD OF LAW

### A.     Summary Judgment

The Court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (internal quotation marks omitted) (emphasis in original). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see, e.g., Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion, see, e.g., Sec. Ins. Co. of Hartford v. Old Dominion Freight Line. Inc., 391 F.3d 77, 83 (2d Cir. 2004); Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. The nonmoving party may not rely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett,

8

477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986) (internal citations omitted).

The Second Circuit has often cautioned that courts should be "chary" in granting summary judgment in employment discrimination cases, where intent of the employer is usually a central factual issue. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 71 (2d Cir. 2000) (citing Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 87 (2d Cir. 1996)); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). "[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999). Notwithstanding, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001). "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Schwapp, 118 F. 3d at 110; see also Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994) ("[S]ummary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact.").

**B.      Title VII, Section 1981, and New York Human Rights Law Claims**

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), or to retaliate against an employee who

complains of a Title VII violation, see 42 U.S.C. § 2000e-3(a). Stafford alleges that, in violation of Title VII, defendants discriminated against her and other security officers on the basis of race and retaliated against her for complaining about alleged discrimination.

Race discrimination claims brought under Title VII are analyzed with the McDonnell Douglas burden-shifting test. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). The initial burden of production lies with the plaintiff. To establish a prima facie case of discrimination, a plaintiff must show (1) she was within the protected class, (2) her job performance was satisfactory, (3) she was subjected to an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. See Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1995); see generally McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. Although "the burden of establishing a prima facie case is not onerous, and has been frequently described as minimal," Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997); see also Berube v. A&P, 348 Fed. Appx. 684, 686 (2d Cir. 2009) (characterizing plaintiff's prima facie burden as "minimal" and "de minimis"), the Second Circuit has also noted that a "jury cannot infer discrimination from thin air," Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998).

If a Title VII plaintiff is able to establish a prima facie case of discrimination, the burden of persuasion shifts to the employer-defendant to articulate a legitimate, nondiscriminatory rationale for its actions. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094 (1981). Once the employer meets its burden, the presumption of discrimination that arose from plaintiff's statement of a prima facie case is eliminated. See Hunter v. St. Francis Hosp., 281 F. Supp. 2d 534, 542 (E.D.N.Y. 2003). The burden then shifts back to the plaintiff to demonstrate that the employer's stated rationale is merely a pretext for discrimination. See

McDonnell Douglas, 411 U.S. at 803-04, 93 S. Ct. at 1824-25; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749 (1993); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 2106 (2000); see also Droutman v. N.Y. Blood Ctr., Inc., No. 03-cv-5384, 2005 WL 1796120, at *4 (E.D.N.Y. July 27, 2005) (plaintiff must "prove that the employer's stated reason for its actions is merely pretextual, and that discrimination was an actual reason for the adverse employment action"). A plaintiff at this stage may rely on the same facts used to support her prima facie case so long as a preponderance of the evidence would enable a reasonable jury to find discrimination lurking behind the employer's stated reasons for the adverse action. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 203 (2d Cir. 1995) ("[T]he plaintiff's ultimate burden . . . may often be carried by reliance on the evidence comprising the prima facie case, without more."). Importantly, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision," but only that discrimination motivated at least some part of the employer's action. Id. Absent "evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject," the conflict between the plaintiff's prima facie case and the employer's nondiscriminatory justification is a question of fact for trial. Id.

Claims under 42 U.S.C. § 1981 and NYSHRL are governed by the same McDonnell Douglas burden-shifting analysis as Title VII claims. See, e.g., Pergament v. Federal Express Corp., No. 03-CV-1106, 2007 WL 1016993, at *7 n.8 (E.D.N.Y. Mar. 30, 2007); see also Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010). The primary pertinent difference among the statutory regimes is that § 1981 covers racial discrimination only, see Pergament, 2007 WL 1016993, at *7 n.8, while NYSHRL also covers discrimination on the basis of sexual orientation, see N.Y. Exec. Law § 296(1)(a).

## III.   DISCUSSION

### A.   Title VII Claims Against the Individual Defendants

As an initial matter, it is well-settled in this circuit that individual supervisors are not subject to liability under Title VII. See, e.g., Patterson v. County of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004); Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam). Accordingly, Stafford's Title VII claims against Scaglione and Walsh are dismissed.

### B.   Title VII Claim Against the Hospital – Racial Discrimination

As the McDonnell Douglas analysis requires, the burden first falls to plaintiff to produce a prima facie showing of discrimination, that is, at least a minimal showing of "circumstances that would be sufficient to permit a rational fact-finder to infer a discriminatory motive." Perry v. State Ins. Fund, No. 01-CV-3590, 2006 WL 3246923, at *6 (E.D.N.Y. Nov. 8, 2006) (citing McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)). Such circumstances may include "an employer's criticism of the plaintiff's performance in ethnically degrading terms" or an employer's "invidious comments about others in employee's protected group," Chambers, 43 F.3d at 37 (2d Cir. 1994), or "that the employer subjected [plaintiff] to disparate treatment, that is, treated [plaintiff] less favorably than a similarly situated employee outside [plaintiff's] protected group," Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).

Stafford meets this initial burden, although the record contains scant support for her claim. Plaintiff alleges that her shifts were changed, that she was demoted, and that her responsibilities were decreased, while those of white employees were not. Understanding that these claims are mostly generalized and conclusory, the Court will assume their truth arguendo. Still, Stafford's sole specific assertion giving rise to an inference of racial discrimination[2] is her

---

[2]   Plaintiff also seems to assert that she suffered disparate treatment vis-à-vis Officer Burgos,

allegation that Walsh said "[y]ou could leave now, we don't need your kind here" when he fired her, which can be construed as degrading plaintiff on the basis of her race.[3]

The burden then shifts to the hospital to articulate a legitimate nondiscriminatory reason for the termination. There is certainly substantial evidence in the record that Stafford's performance was poor. It had been repeatedly criticized from 2000 to 2003. The criticism was coupled with numerous warnings, cautions, and two probationary periods. Indeed, she had been given a "final warning for future behavior" six months before the fire incident. Defendants contend, moreover, that Stafford's demotion from lieutenant to sergeant was purely a business decision, based neither on discrimination nor her performance (and the elimination of the lieutenant positions also affected a white male employee). Defendants further argue that Stafford's shift was changed first as a result of the business decision to eliminate the lieutenant positions and then as a result of Stafford's PIPs. However, while Stafford's poor performance *before* the fire incident is well documented, evidence of her performance *during* and *after* the fire is shrouded. There is, it is true, at least some evidence to suggest that Stafford initially

---

but she fails to show that she and Burgos were similarly situated. "[I]n order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." Mazzella v. RCA Global Commc'ns, Inc., 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986). Here, even if it is assumed that Stafford and Burgos shared the same supervisor (ignoring the fact that Stafford was Burgos's supervisor), the record shows a key distinction between the two, namely, that Stafford was on a final warning at the time of the fire while Burgos was not. Stafford does not present any evidence to the contrary.

[3]     Even this allegation rests on shaky ground, as Stafford conceded at her deposition that she understood the remark to refer only to her sexual orientation and, by inference, not to her race. However, although equivocal in expanse, the remark was clearly intended to be personally pejorative, and the Court shall construe this inference in Stafford's favor for purposes of deciding the motion for summary judgment. See Sec. Ins. Co. of Hartford, 391 F.3d at 83.

downplayed the severity of the fire during the hospital's investigation, but the record of what she allegedly did wrong during the incident is far from clear. The hospital maintains that Stafford was negligent in her search of the patient before the fire and in her supervision of security officers during the fire, but these assertions are conclusory and unsubstantiated by record evidence. Yet, given that the employer's burden here is "one of production, not persuasion," Reeves, 530 U.S. at 142, 120 S. Ct. at 2106, the hospital succeeds in establishing nondiscriminatory reasons for the termination.

Accordingly, the onus falls back onto plaintiff to offer proof that would allow a reasonable jury to conclude that the hospital's proffered reasons for termination were a pretext for discrimination.[4] See Schnabel, 232 F.3d at 88. Overall, the evidence in the record casts doubt upon the veracity of the hospital's contentions of nondiscriminatory justification and raises at least the inference that something other than Stafford's subpar job performance was a factor in her termination. Stafford does not muster any evidence to support her cause beyond her prima facie case; specifically, for example, she fails to present any proof that her demotion and shift changes were pretextual. But tellingly, defendants never directly deny or refute Walsh's remark upon terminating Stafford. Equally important is the context in which Walsh's comment was made, namely, Walsh's investigation of the fire. While there is evidence that Stafford tried to downplay the severity of the fire, Walsh appears to have exaggerated its severity. The Corrective Action Report suspending Stafford for five days, signed by Walsh on July 29, 2003, claimed that Stafford's "failure to supervise personnel resulted in the near death of a patient," whereas the record is plain that the patient's body suffered no burns at all. Further, Walsh's investigation reports state that the temperature in the room reached 1200 degrees Fahrenheit,

---

[4]  As discussed infra, this conclusion does not hold for other claimed adverse employment actions.

14

which is almost certainly a gross exaggeration. Accordingly, the question is whether a jury could reasonably construe Walsh's remark, in the context of investigating and firing Stafford, as persuasive evidence that Walsh acted, at least in part, out of discriminatory animus. See Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 114 (2d Cir. 2007) ("[T]he question in adjudicating the defendants' motion for summary judgment becomes simply whether the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that her dismissal was motivated at least in part by . . . discrimination.")

The Second Circuit recently identified four factors to assist district courts in determining whether a remark is probative of discriminatory motivation: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 149 (2d Cir. 2010). Put differently, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination," whereas conversely, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." Tomassi, 478 F.3d at 115.

Analyzed under the standards articulated in Tomassi and Henry, Walsh's statement to Stafford could lead a reasonable jury to find the hospital liable under Title VII. Walsh was not the ultimate decision-maker, but he was one of Stafford's supervisors; more importantly, his investigative report was the proximate cause of Stafford's termination. As for timing, crucially, the remark was not only contemporaneous with the termination, it was part of the termination

announcement itself. The content was clearly derogatory and arguably directed to Stafford as a person rather than to her performance. A reasonable juror could certainly view the remark as racially charged. As for context, the remark came from Walsh on the heels of his investigation of the fire, his suspension of Stafford in a report that badly exaggerated the severity of the fire, and his finding of multiple faults with Stafford's performance during and after the fire. Indeed, it is difficult to imagine a remark "closer" in time and context "to the allegedly discriminatory behavior." Id. See also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000) (reversing summary judgment for employer in age discrimination case where plaintiff was told he should "retire," by the person responsible for plaintiff's termination, during the termination meeting); cf. Rose v. New York City Bd. of Educ., 257 F.3d 156, 162 (2d Cir. 2001) (contrasting "the stray remarks of a colleague" with "comments made directly to" the plaintiff by someone with "enormous influence in the decision-making process"); Ostrowski v. Atl. Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992) (describing remarks as "stray" when made "in the workplace by persons who are not involved in the pertinent decisionmaking process").

In the end, while the hospital does provide some nondiscriminatory reasons for Stafford's termination — including the obvious fact that any failure on her part that contributed to the ignition of a fire in a hospital is in and of itself a serious matter — given the genuine issues of material fact embedded in the record, as well as the timing and context of Walsh's remark, a reasonable jury could find that at least *one* motivating factor for Stafford's termination was the discriminatory animus of Walsh. See Cronin, 46 F.3d at 203; see also Tomassi, 478 F.3d at 116 ("The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class."). Although defendants attribute the termination to

Stafford's inconsistent job performance, an interpretation with which a jury may someday also agree, it is the Court's "obligation at this stage to interpret ambiguities in the evidence in the light most favorable to the plaintiff." Tomassi, 478 F.3d at 116; see also Sassaman v. Gamache, 566 F.3d 307, 313 (2d Cir. 2009) (even where an allegedly discriminatory remark was made after the termination, "[t]he choice between plausible interpretations of [the supervisor's] remarks is a question of fact to be resolved by a jury"). Summary judgment for the hospital on the Title VII racial discrimination claim relating to her final suspension and termination is therefore denied.

However, to the extent that Stafford's complaint can be construed to assert a separate Title VII discrimination claim for her demotion and shift changes, rather than her suspension and termination, partial summary judgment is granted to the hospital. While plaintiff presents a prima facie case of discrimination as described above, the hospital presents ample evidence of nondiscriminatory justification for her demotion from lieutenant back to sergeant: all of the lieutenant positions were eliminated, and Lt. Rice, a white male, was demoted alongside Stafford. Moreover, according to the hospital, Stafford's shift changes occurred as a result of her poor performance and subpar evaluations. Yet plaintiff fails to provide any record evidence, as opposed to mere conclusory allegations, that the hospital's justifications for the demotion and shift changes were pretexts for discriminatory animus. Accordingly, any such Title VII claim is dismissed.

### C. Title VII Claim Against the hospital – Retaliation

Turning now to the retaliation claim, Title VII provides that "[i]t shall be unlawful . . . for an employer to discriminate against any of his employees . . . because he has opposed any practice made unlawful by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

17

this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are also analyzed under McDonnell Douglas. See McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. First, a plaintiff must establish a prima facie case showing that: (1) the plaintiff was engaged in protected activity by opposing an employment practice made unlawful by Title VII; (2) her employer knew of the activity; (3) plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. See McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001); Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996). If a prima facie showing is made, the burden shifts to the defendant to establish a legitimate, nonretaliatory basis for the complained-of action, and subsequently shifts back to the plaintiff, who must show that the legitimate, nonretaliatory reason articulated by the defendant is a mere "pretext," and that retaliation was more likely than not the reason for the complained-of action. See Schnabel, 232 F.3d at 90; Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998).

Stafford claims that the hospital retaliated against her after she made two complaints: first, in April 1998, to Kathryn Martin, of Scaglione's allegedly disparate treatment of African-American employees in the security department, and, second, in or around April 2000, to Ronnie Meyers, in response to a negative evaluation she received from Scaglione that she contends was racially motivated. She then asserts that, as a result of her complaints, Scaglione eliminated her position as lieutenant on the night shift, transferred her to the day and evening shifts several times, placed Stafford under his direct supervision, and then treated her differently than he treated white security officers, culminating in her termination after the fire incident. The Court will consider each of the allegations of retaliation in turn.

1.    Complaint to Martin in April 1998

Stafford claims that she met with Martin in April 1998 to complain of Scaglione's disparate treatment of African-American security officers and, specifically, the hospital's failure to promote her to lieutenant. Martin's letter to Stafford on April 14, 1998 does not mention disparate treatment but notes a complaint as to Scaglione's "management style" and the "atmosphere" in the security department. The letter also states that a follow-up meeting would be held with Scaglione, Dr. Robert Kelly, and Henry Dennis, the director of employee relations. For motion purposes, the Court infers from this letter that Stafford complained about disparate treatment based on race and that Scaglione learned in short order of Stafford's complaint. Even so, however, there is no evidence of a causal connection between this April 1998 complaint and any adverse employment actions that followed.

The law in the Second Circuit holds that "[c]ausation may be proved by showing that the retaliatory action was close in time to the protected activities; that other similarly situated employees were treated differently; or by offering direct proof of retaliatory animus." Allen v. St. Cabrini Nursing Home, Inc., 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002); see also, e.g., Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990); DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)). As for timing, the first adverse action presented for review is the negative evaluation Stafford received in or around April 2000, two years after Stafford's complaint to Martin, far too long a delay to support an inference of a causal connection. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'") (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)). Specifically,

19

"[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation," Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005), and "[s]ix months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation." Id. (citing Breeden, 532 U.S. at 273-74, 121 S. Ct. at 1511); see Jimenez v. City of New York, 605 F. Supp. 2d 485, 528 (S.D.N.Y 2009) (noting that, "[i]n general, when more than three months have passed between a protected activity and an alleged retaliatory response, the Second Circuit has deemed the evidence insufficient to raise an issue of fact concerning causation."). Stafford fares no better in pursuing the other avenues for establishing a prima facie case, disparate treatment or retaliatory animus. She presents no evidence of either. In fact, Stafford's fortunes *improved* after the meeting with Martin, as Scaglione met with her in February 1999 and promoted her to lieutenant later that month.[5] Accordingly, Stafford fails to present a prima facie case of retaliation based on the April 1998 complaint to Martin, and summary judgment is warranted on this issue.

2. Complaint to Meyers in April 2000

The parties do not contest that Stafford met with Meyers in or around April 2000 to complain of her negative evaluation from Scaglione, that Meyers contacted Scaglione, that Meyers suggested amendments to the evaluation, and that the evaluation was subsequently amended. There is no record evidence, however, that Stafford complained to Meyers of disparate treatment based on race or any other ground protected by Title VII. Her sole complaint, it seems, was that Scaglione's evaluation was inaccurate and unfair. Although the Court draws all inferences in plaintiff's favor, "[a] jury cannot infer discrimination from thin

---

[5]  Plaintiff effectively argues that she should have been promoted to lieutenant earlier than she was. But there is no evidence before the Court regarding such openings, whether Stafford formally applied, whether the position was filled, or by whom. No prima facie claim in this regard is stated under Title VII.

air." Norton, 145 F.3d at 119. Accordingly, there is insufficient support for a prima face case of retaliation based on the April 2000 complaint to Meyers. Again, summary judgment for defendants is warranted.

### D.    Section 1981 Claims

The analysis of Stafford's claims under 42 U.S.C. § 1981 generally follows the analysis of her racial discrimination claims under Title VII, supra. See Pergament, 2007 WL 1016993, at *7 n.8. The one exception is that individuals are liable under § 1981. Applying the Title VII analysis to Scaglione and Walsh individually, the Court finds that the evidence proffered by Stafford is sufficient for a reasonable jury to find race discrimination against Walsh but not Scaglione: Walsh's investigation of the fire incident was arguably dubious, and his remark in the course of terminating Stafford is uncontested. While Stafford has made a number of assertions of discriminatory behavior by Scaglione, none of them are supported by record evidence of racial taint, and the Court may not rely on such unsubstantiated and conclusory allegations in determining a motion for summary judgment. See Scotto, 143 F.3d at 114; Schwapp, 118 F.3d at 110. Moreover, it is worth noting that it was Scaglione who promoted Stafford to lieutenant in February 1999 and then extended her PIP for another three months in October 2002 rather than terminating her. Accordingly, summary judgment on the § 1981 claims is granted as to Scaglione but denied as to Walsh.

### E.    Title VII Claim Based on Sexual Orientation

Stafford also brings a Title VII claim based on sex discrimination, supporting this claim with allegations that defendants discriminated against her as a lesbian. Title VII does not prohibit sex discrimination on the basis of sexual orientation, only gender. See Simonton v. Runyon, 232 F.3d 33, 37 (2d Cir. 2000). Stafford has never alleged that she was discriminated

21

against because she is a woman. Accordingly, the sexual orientation claim styled as a sex discrimination claim must be dismissed.

### F. NYSHRL Claims

The analysis of NYSHRL claims is another which parallels that of Title VII claims. See Spiegel, 604 F.3d at 80. This time, though, the claim is based on sexual orientation as well as race. Still, the Court's discussion of the facts, supra, applies equally to both types of discrimination. A jury, moreover, could reasonably determine that Walsh's derogatory remark in terminating Stafford, "we don't need your kind here," was discriminatory against Stafford on the basis of her sexual orientation as well as her race. Pointedly, the burden-shifting analysis regarding Stafford's job performance and Walsh's investigation of the fire incident holds with equal force to plaintiff's NYSHRL claims, as does the Court's analysis of the § 1981 claims against Scaglione and Walsh.[6] Thus the Court grants summary judgment on the NYSHRL claims as to Scaglione but denies the motions as to Walsh and the hospital.

---

[6] Defendants argue that their purported lack of knowledge of Stafford's sexual orientation is fatal to her NYSHRL claim. There is at least some authority to suggest that such knowledge is pertinent to a prima facie claim of discrimination in the McDonnell Douglas analysis, as sexual orientation is not a patent or documented attribute, and it would seem difficult to infer discrimination from circumstances in which the alleged malefactor had no knowledge of the trait against which he was supposedly discriminating. See Swinton v. Fazekas, No. 06-CV-6139T, 2008 WL 723914 (W.D.N.Y. Mar. 14, 2008) (citing Geraci v. Moody-Tottrup, Int'l, 82 F.3d 578, 581 (3d Cir. 1996)); Brennan v. Metro. Opera Ass'n, 284 A.D.2d 66, 70 (1st Dep't 2001) (same); Arthur v. Standard & Poor's Corp., 6 Misc. 3d 1033(A), 800 N.Y.S.2d 342 (N.Y. Sup. Ct. 2005) (same). This particular legal issue is irrelevant at this stage, however, as there is a genuine issue of material fact as to whether defendants knew of Stafford's sexual orientation prior to her termination. While Stafford's claim regarding Scaglione's access to her recorded telephone conversations is pure speculation, she asserts that, due to calls she received from her significant other while at work, her sexual orientation was "common knowledge" within the security department. Defendants counter that Stafford never told anyone in the department of her sexual orientation; Stafford admits as much. Yet none of the defendants contest the allegation that Stafford's sexual orientation was "common knowledge," and, notably, neither Scaglione nor Walsh attested anything to the contrary in their affidavits. There is thus no basis for summary judgment on the issue of defendants'

## IV.    CONCLUSION

For the foregoing reasons, summary judgment is granted as to all defendants on the sex discrimination claim and the retaliation claim, granted as to defendant Scaglione on all claims, granted as to defendant Walsh on all Title VII claims, and granted as to the hospital to the extent that plaintiff asserts a separate Title VII claim for race-based discrimination arising from her demotion, shift changes, or any other adverse action aside from her final suspension and termination.  Defendants' motions are otherwise denied.  The remaining parties are directed to contact Magistrate Judge Pollak to make final preparations for trial.

SO ORDERED.

Dated: Brooklyn, New York
    March 23, 2011

s/Eric N. Vitaliano

ERIC N. VITALIANO
United States District Judge

---

purported lack of knowledge of Stafford's sexual orientation.